# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3926

_____

| | | |
|---|---|---|
| Rosa Maria Lopez; Regions Bank, Special Administrator for the Estate of Isidro Lopez, Deceased, | * * * * | |
| Plaintiffs/Appellees, | * * | |
| v. | * * | Appeal from the United States District Court for the |
| Robert Mendez; Roadway Express, Inc., | * * | Eastern District of Arkansas. |
| Defendants/Appellees, | * * | |
| v. | * * | |
| James Construction Group, Originally Sued As Angelo Iafrate Construction, L.L.C., | * * * * | |
| Third Party Defendant/ Appellant. | * * | |

_____

Submitted: October 12, 2005
Filed:  December 23, 2005(Corrected: 1/06/06)

_____

Before BYE, BEAM, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

James Construction, L.L.C. ("James") appeals from a judgment entered on a jury verdict finding James 40% responsible for a traffic accident in a construction zone. James, a contractor, performed highway construction work for the State of Arkansas. James argues that the acquired-immunity doctrine shielded the company from liability and that the district court[1] therefore erred in denying its motion for judgment as a matter of law or, in the alternative, a new trial. We affirm.

## I. *Background*

James contracted with the Arkansas Highway and Transportation Department ("AHTD") to complete highway improvements and paving work at the intersection of Interstates 40 and 440. The contract expressly provided that "[t]he contractor shall assume full responsibility for the safe and uninterrupted movement of traffic through construction areas for the duration of the project." This responsibility included erecting and maintaining traffic control devices, such as traffic barrels, construction warning signs, yield signs, and stop signs. To ensure that James fulfilled its duty to adequately warn motorists, the contract required James to: (1) comply with every detail of the contract's plans and specifications;[2] (2) comply with the Manual on Uniform Control Devices for Streets and Highways ("MUTCD");[3] (3) take steps

---

[1]The Honorable J. Leon Holmes, Chief Judge, United States District Court for the Eastern District of Arkansas.

[2]Standard Specifications § 104.01 provided that:

The intent of the Contract is to provide for the construction and completion of every detail of the work described. The Contractor shall furnish all labor, materials, equipment, tools, transportation, and supplies required to complete the work according to the plans, specifications, and terms of the Contract.

[3]The construction contract required James to erect and maintain traffic control devices in accordance with the MUTCD. The proper location of the signs, the proper number of the signs, and the proper spacing of the signs as outlined in the MUTCD applied to the contract. Section 604.03 of the standard specifications specifically

James deemed reasonably necessary to provide the safe flow of traffic and the safety of the public; and (4) correct any deficiencies that were out of compliance with the plans and specifications, the MUTCD, or James's judgments about what was reasonably necessary to protect the safety of the public.

While doing asphalt-paving work on Interstate 40, James constructed a temporary ramp between the two highways. The permanent on-ramp from Interstate 440 East to Interstate 40 East curves in a gradual arc to the right, which allows drivers to maintain their speed close to normal highway speed as they merge from Interstate 440 to Interstate 40. James had blocked off the permanent on-ramp at a point about half way along its length. At that point, James had diverted traffic onto a temporary ramp. This temporary ramp curved back to the left, away from the arc of the permanent on-ramp, and then intersected Interstate 40 at an angle. James placed stop signs at the end of the temporary ramp, one on each side of it.

Tragically, an accident occurred near the construction zone. A Roadway Express, Inc. ("Roadway") tractor-trailer driven by Robert Mendez collided with a vehicle driven by Isidro Lopez and his wife, Rosa. The accident occurred when Mendez attempted to exit Interstate 440 and enter Interstate 40 eastbound via the temporary ramp. Mendez's truck struck a car parked at the stop sign, crossed two eastbound lanes of Interstate 40, the median, and two westbound lanes of Interstate 40, and finally struck the Lopez automobile. The impact killed Mr. Lopez and seriously injured Mrs. Lopez.

Mrs. Lopez subsequently brought a wrongful death and survival action in tort against Mendez, Roadway, and James. One of the hotly-contested factual issues at trial was whether James had placed "Stop Ahead" signs to warn motorists of the upcoming stop signs placed at the juncture of the temporary ramp at Interstate 40. No

---

stated that compliance with the MUTCD was required.

party disputed that the original plans called for "Yield" signs at that junction and "Yield Ahead" signs that motorists would see before approaching the intersection of the temporary ramp and Interstate 40. According to James, this plan had been orally modified to allow the use of "Stop" and "Stop Ahead" signs rather than the "Yield" and "Yield Ahead" signs. At trial, the parties disputed whether these signs were in place when the accident occurred.

During the trial, James moved for a directed verdict, claiming it was protected from liability by the Arkansas doctrine of acquired-immunity. The district court denied the motion. The jury returned a verdict for Mrs. Lopez, finding both James and Mendez negligent. The jury also found that James failed to perform its work in accordance with its contract with the State of Arkansas. Finally, the jury found that Roadway and Mendez were 60% responsible and James was 40% responsible for the accident.

The district court entered judgment on the jury's verdict. James then moved for judgment as a matter of law or, in the alternative, for a new trial. The trial court denied James's motion. James appeals, arguing that the acquired-immunity doctrine bars any liability being assigned to James because representatives for the State of Arkansas testified at trial that James had performed according to the plans and specifications in the contract; in addition, James argues that the district court's instructions to the jury did not accurately reflect the law and deprived James of its acquired-immunity defense, entitling James to a new trial.

## II. *Discussion*
### A. *Acquired-Immunity Doctrine*

James contends the district court erred in denying its motion for judgment as a matter of law or, in the alternative, a new trial because it is entitled to acquired immunity. In response, appellees assert that James is not entitled to acquired immunity because the jury could find James negligently performed its contract with the State of

Arkansas from evidence of record. We review the district court's decision to deny a motion for judgment as a matter of law de novo. *Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d. 893, 896 (8th Cir. 2002). We review a district court's decision to deny a motion for a new trial under an abuse of discretion standard. *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005).

In general, litigants may not sue the State of Arkansas because of the state's sovereign immunity. *Univ. of Ark. for Med. Sci. v. Adams*, 117 S.W.3d 588, 590 (Ark. 2003). The state's sovereign immunity does not extend to independent contractors engaging in work for the state. *Southeast Constr. Co. v. Ellis*, 342 S.W.2d 485, 488 (Ark. 1961). However, the acquired-immunity doctrine creates an exception to this rule. The exception provides that a contractor who performs its work according to the terms of its contract with a governmental agency, and under the governmental agency's direct supervision, is not liable for damages resulting from its performance. *Smith v. Rogers Group, Inc.*, 72 S.W.3d 450, 455 (Ark. 2002). Thus, if damages result from the contractor's performance of a construction contract with the state, "and the damages result from something inherent in the design and specifications required by the public agency, the contractor is not liable unless he is negligent or guilty of a wrongful tort." *Guerin Contractors, Inc. v. Reaves*, 606 S.W.2d 143, 144 (Ark. App. 1980). The purpose of the doctrine is to protect an "innocent contractor who has completely performed the work to the government's plans and specifications." *Smith*, 72 S.W.3d at 456.

The acquired-immunity doctrine, however, does not protect a contractor "who performs the contract in a negligent manner resulting in damages to others." *Id*. Therefore, while the doctrine shields from liability a contractor who performs in accordance with the terms of the contract, it does not shield from liability a contractor who acts negligently while performing the terms of the contract. *See Barker v. Rogers Group, Inc.*, 45 S.W.3d 389, 394 (Ark. App. 2001).

*Muskogee Bridge Co., Inc. v. Stansell*, 842 S.W.2d 15 (Ark. 1992) provides helpful guidance on the operation of the doctrine. In *Muskogee*, a bridge contractor contracted with the State of Arkansas to perform a bridge construction project. The contractor was to perform the work in accordance with AHTD plans and specifications. *Id*. at 17. The construction contract obligated the contractor to furnish all signs, barricades, and temporary traffic control devices for temporary hazard protection. In addition, the contract stated that the contractor must take all action reasonably necessary to protect the public. *Id*. at 19. During the construction of the bridge, the plaintiff crossed the bridge, hit a drop-off caused by the construction, lost control of her car, and hit another car. *Id*. at 17. The contractor failed to erect any signs indicating the dangerous drop-off despite the contract's express language. *Id*. The plaintiff sued the contractor, alleging that it negligently left a dangerous drop-off in the roadway and failed to adequately warn motorists about the dangerous condition. *Id*. At trial, an AHTD representative testified that the drop-off could only have been an inch-and-a-half according to the project specifications but agreed that if something there created the effect of a speed bump then something "was not right." *Id*. at 18. Similarly, the contractor's project supervisor testified that the drop-off was only an inch-and-a-half deep. *Id*. Four other witnesses, however, testified that the drop-off was significantly deeper. *Id*. at 18–19. Based on this evidence, the Arkansas Supreme Court held that the trial court was correct in finding that the contractor was not protected by the acquired-immunity doctrine. *Id*. at 20.

On different facts, the Arkansas Supreme Court, in *Smith*, held that an asphalt contractor was entitled to acquired immunity. 72 S.W.3d at 457. The plaintiffs had brought a negligence action against the contractor, alleging that the contractor used an inappropriate type of asphalt—Type 3 asphalt—on a high-volume highway, which increased the potential for accidents caused by hydroplaning. *Id*. at 453. The contract between the contractor and the AHTD, however, specifically called for the use of Type 3 asphalt. *Id*. The undisputed evidence submitted at trial demonstrated that the contractor performed its contract with the AHTD exactly as specified. *Id*. at 457. The

resident engineer of the AHTD testified that the contractor completed the project in full compliance with the specifications as set forth in the contract. *Id.* Because the contractor acted in accordance with the terms of the contract in performing the contract, it was entitled to acquired immunity. *Id.*

This case is more analogous to *Muskogee* than to *Smith*. Here, Lopez, like the plaintiff in *Muskogee*, alleged that James was negligent for failing to perform according to the terms of the contract with the State of Arkansas, not for acting in accordance with the terms of the contract as in *Smith.* James's contract with the AHTD provided that all traffic control devices used on the road would conform to the MUTCD, which required James to use a complete series of signs to alert drivers as they approached the construction site. In addition, James and the AHTD had orally modified the plans and specifications to require "Stop" and "Stop Ahead" signs at the juncture of the temporary ramp at Interstate 40.

Several witnesses testified that they saw no "Stop Ahead" signs on the night of the accident. First, Mendez testified that prior to encountering the temporary ramp, he saw a sign about a half mile back from the temporary ramp that read "Road Work Ahead" but saw no other signs, warnings, or "Stop Ahead" signs. Second, David Franklin, another motorist, testified that he did not see any "Stop Ahead" signs. Third, Jerry Bishop, Roadway's corporate representative, stated that when he went to the accident scene, he did not see any "Stop Ahead" signs. Fourth, Trooper Michael Dawson, who investigated the accident for the Arkansas State Police, testified that he did not see, nor make any note of, any "Stop Ahead" signs. Additionally, the video of the scene taken from Dawson's in-car camera a few hours after the accident showed that no stop signs were located in the spot where Traffic Control Supervisor Jeff Bise—the James employee responsible for setting up the traffic control devices—originally claimed he erected them.

Traffic Control Engineer Archie Burnham testified that if there was a detour and a lane closure on an interstate highway, the MUTCD would require James to use a complete series of warning signs to alert drivers as they approached the construction site; such warnings signs had to appear on both sides of the highway. Burnham also stated that the failure to use a complete series of signs to repeatedly warn drivers as they approached the scene would violate the MUTCD and constitute a "gross violation of the minimum standards in traffic control." Finally, Scott Eldridge, an inspector for the AHTD, testified that if no "Stop Ahead" signs were present on the night of the accident, then James would have been in violation of the contract with the State of Arkansas.

Whether James was negligent in its performance of the contract was a question of fact for the jury. Given the substantial evidence that the required warning signs were not in place on the night of the accident as contractually required, we hold that the district court did not err in refusing to grant the motion for judgment as a matter of law, or in the alterative, for a new trial.

## B. *Jury Instruction*

James also argues that the district court erred in giving Instruction No. 25 to the jury, claiming that the first sentence of the instruction stripped it of its acquired-immunity defense. In response, the appellees contend that the district court did not abuse its discretion in instructing the jury according to Arkansas Model Jury Instruction (AMI) 1202. We hold that the district court did not abuse its discretion in giving Instruction No. 25.

Instruction No. 25 stated the following:

> It was the duty of James Construction Group, L.L.C., in the performance of the construction work to use ordinary care to provide for the safety of the traveling public and to give reasonable warning to travelers of any hazards created by its activities. It was also the duty of James

Construction, L.L.C., to use ordinary care to comply with the provisions of its contract with the Arkansas State Highway Department, including any modifications thereof, that were inserted for the safety of the public.

The district court took Instruction No. 25 verbatim from AMI 1202. In the manual, the second sentence of AMI 1202 is in brackets, meaning that the district court should give it in some circumstances but not others. In contrast, the first sentence of AMI 1202—the one to which James objects—is not in brackets, which means that it should always be given. In Arkansas, a trial judge is to give the applicable model instruction unless it does not accurately state the law. *Adkins v. Kelley*, 424 S.W.2d 373, 376 (Ark. 1968). Instruction No. 25 correctly stated Arkansas law.

With regard to a contractor's duty to protect the public, the Arkansas Supreme Court stated in *Muskogee*:

Under the contract Muskogee Bridge was to provide safeguards to protect the public from dangerous conditions. But apart from the agreement, Muskogee Bridge, as general contractor, had a duty to protect the public against unreasonably dangerous conditions on the job site.

842 S.W.2d at 20. Just as in *Muskogee*, James had a duty under the contract to provide safe traffic flow at all times. Bise admitted that James had a duty under the contract to make its own determinations about what was reasonably necessary to protect the public's safety. Thus, like *Muskogee*, the contract required James to provide safeguards to protect the public from dangerous conditions. In addition, under *Muskogee*, apart from the contract, a general contractor has a duty to protect the public against unreasonably dangerous conditions on the job site.

Finally, the question of whether a party is entitled to immunity is a question of law, not fact. *See Creashak v. Adhere Sch. Dist.*, No. 04-1291, 2005 WL 1120239

(Ark. May 12, 2005) (stating that whether Arkansas school districts are entitled to sovereign immunity is a question of law). As such, the question of immunity is for the court. Here, the district court did not give the jury any instructions regarding the acquired-immunity doctrine. Instead, the district court submitted to the jury the disputed fact question of whether James performed its work in accordance with the terms of its contract with the State of Arkansas. Because the jury unanimously answered "no," the district court determined, as a matter of law, that the acquired-immunity doctrine did not shield James from liability for its negligence.

Accordingly, we affirm the district court's denial of James's motion for judgment as a matter of law and the district court's denial of James's motion for a new trial.

_____